Filed 12/21/22  P. v. Weir CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>RANDALL WEIR,<br><br>Defendant and Appellant. | B311555<br><br>(Los Angeles County<br>Super. Ct. No. NA098599) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Richard M. Goul, Judge.  Affirmed.

Cliff Gardner, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Noah P. Hill and Thomas C. Hsieh, Deputy Attorneys General, for Plaintiff and Respondent.

Randall Weir (defendant), whose first two trials ended in hung juries, appeals from the judgment entered following his conviction by a third jury of three counts of first degree murder (Pen. Code, § 187, subd. (a)).  As to all three counts, the jury found that a principal was armed with a firearm (§ 12022, subd. (a)(1)) and defendant personally and intentionally discharged a firearm causing great bodily injury and death (§ 12022.53, subds. (b)-(d)).  The jury also found the multiple-murder special-circumstance allegation (§ 190.2, subd. (a)(3)) to be true.  Defendant was sentenced to three terms of life without the possibility of parole, plus 75 years to life.

The trial court also imposed a $300 restitution fine, a $30 criminal conviction assessment pursuant to Government Code section 70373, and a $40 court security assessment pursuant to Penal Code section 1465.8, subdivision (c).  The minute order and abstract of judgment reflect the imposition of only one Government Code section 70373 assessment and only one Penal Code section 1465.8 assessment.

We direct the trial court to amend the judgment to reflect the imposition of a total of three Government Code section 70373, subdivision (a) assessments and three Penal Code section 1465.8, subdivision (a) assessments.  We otherwise affirm the judgment.

### BACKGROUND

Two groups had a violent dispute over a large quantity of marijuana that went missing.  One group consisted of defendant, his codefendant Howard Williams,[1] and Howard's cousin, Tevin

---

[1]     Defendant Weir and his codefendant Howard Williams were tried together.  Because Howard Williams has the same

Lampart.  The other group consisted of Narada Brooks, Laurent Latty, Dwayne Cover, Courtney Murray, and Cleon Sterling. Cover and Murray died inside their apartment from gunshot wounds.  Latty, who was also shot, died in the apartment building stairwell.

At the trial, the prosecutor argued that defendant and Howard committed the murders and that defendant was the shooter.  Defense counsel argued that Brooks was the killer and that defendant had fired only in self-defense.

**Evidence at trial**[2]

### *Brooks's testimony*

Brooks testified that he, Latty, Cover, Murray, and Sterling were close friends who purchased and sold large quantities of marijuana together for profit.  All five men were at Murray and Cover's apartment, along with Monique Apodaca, a friend of Latty's, on the evening of May 9, 2013.

Earlier that same day, Howard called Brooks and asked him to obtain 50 pounds of marijuana.  Howard and Brooks had known each other for several years and had conducted several marijuana transactions together in the past.  After Brooks obtained the marijuana, he told Howard to meet him at Murray and Cover's apartment.

Howard arrived approximately one hour after the marijuana was delivered to the apartment.  Brooks and others in the apartment bagged and boxed the marijuana, some of which

---

surname as Damion Williams, a witness who testified at the trial, we refer to each of them by their first names to avoid confusion.

[2]     Some of the evidence is summarized later in this opinion in our discussion of the merits of defendant's contentions on appeal.

3

was set aside for Howard. Howard then left the apartment, leaving behind his portion of the marijuana. All of the marijuana was placed in a bedroom before Brooks and the others left the apartment to go clubbing. Defendant, Howard, and Lampart were at one of the two clubs Brooks and his group visited that night.

Early the following morning, Murray, Latty, Sterling, and Apodaca returned to the apartment while Brooks and Cover remained at the club. Approximately 20 minutes later, Murray called Cover and Brooks and informed them that the marijuana was missing. Brooks and Cover returned to the apartment, and Brooks telephoned Howard to notify him that the marijuana was gone.

Murray, Latty, Sterling, and Apodaca were at the apartment when Brooks and Cover arrived. The marijuana was gone and there were no signs of a forced entry.

Defendant, Howard, and Lampart arrived at the apartment approximately 40 minutes later. Howard and defendant were both angry and upset and started blaming Brooks and his group for the missing marijuana. Tensions escalated, Howard said, "this is where the friendship ends," and left the apartment. Brooks then saw defendant remove a small, black, semiautomatic handgun from his waistband, point it at Murray's head, and shoot. Murray was approximately four feet away from defendant at the time. Brooks fled the apartment and down the building stairwell. He was aware of someone running close behind him but did not see the person. Brooks removed a nine-millimeter handgun from his waistband and fired at least two rounds at his pursuer.

4

Brooks ran to a neighbor's yard and hid his gun inside a brick wall. He remained hidden in the yard until he saw defendant and Howard drive away in a gray Ford Explorer.

Brooks then returned to the apartment to retrieve his car keys and a bag containing his belongings. He saw Latty, who appeared to be dead, lying on the floor in the stairwell. Brooks retrieved his belongings from the apartment and then left the scene in his car.

Brooks was arrested later that day. While in custody, he was placed in a jail cell with an informant named Smith, who was wearing a recording device. The device malfunctioned, and the investigating detective asked Smith to memorialize his conversation with Brooks immediately thereafter in a handwritten note.

**Sterling's testimony**

Sterling was at Murray and Cover's apartment on May 9, 2013, when a marijuana delivery arrived late in the evening. Murray, Cover, Latty, Brooks, Apodaca, and Howard were also present. After Brooks, Murray, and Howard packaged the marijuana, Howard left the apartment. Everyone else in the apartment then left together to go to a club. Sterling saw Murray lock the apartment door as they left. Sterling, Brooks, Murray, and Cover drove to the club in one vehicle, and Latty and Apodaca drove there in a separate vehicle.

At 4:00 or 5:00 the next morning, Sterling, Murray, Latty, and Apodaca returned to the apartment. When they reached the apartment door, Murray said, "Fuck. The door is wide open." They entered the apartment and discovered the marijuana was gone. Murray called Cover and Brooks to let them know. After

Cover and Brooks arrived at the apartment, Brooks telephoned Howard.

Howard, defendant, and Lampart arrived at the apartment not long thereafter. Howard was upset. He said the friendship was over and then stepped outside the apartment with defendant for about five minutes. When they returned, defendant whispered something in Howard's ear. Sterling then saw defendant raise his hand to his right, pointing toward Murray. Sterling heard a gunshot and then heard Cover say, "What the fuck." Sterling heard more gunshots as he dropped to the floor and crawled under a table to the apartment balcony. He could hear more gunshots as he crouched on the balcony. From the balcony, Sterling could see Howard walking down the hallway of the apartment building. Sterling could also see Brooks running across the street. When Sterling heard a car pull up, he jumped off the balcony and ran away from the apartment.

**Apodaca's testimony**

Apodaca testified that she and Latty were at an apartment on May 9, 2013, with six or seven other men she did not know. Latty introduced one of the men to Apodaca as Brooks.[3] The men were wrapping marijuana when she and Latty left the apartment to go the mall. When Apodaca and Latty returned, the marijuana was gone, and Apodaca did not see the marijuana again thereafter.

Apodaca, Latty, and the others in the apartment left at some point to go clubbing. Apodaca, Latty, and two of the men

---

[3]     Latty introduced Brooks as "Que." Throughout the trial, witnesses referred to defendant, Howard, the victims, and other present at the crime scene by their monikers rather than their given names.

later returned to the apartment and found the door ajar. Someone called Brooks, who returned to the apartment 20 or 30 minutes later. While Brooks made a phone call, Apodaca saw a silver and black handgun tucked into Brooks's waistband.

Apodaca went into a bedroom where she remained until the police arrived. Through the open bedroom door, Apodaca saw defendant and Howard arrive. She recognized them as having been at the club earlier that night. Someone said "somebody here is a thief" and "the friendship is done." Apodaca then heard gunshots and dropped to the floor. She saw someone in black pants run past the bedroom door, and then she saw Brooks with his arms straight out in front of him walk past. Apodaca hid in the closet when she heard more gunshots near the apartment door. Later, she heard someone come up the stairwell and enter the bedroom where she was hiding. She could not see that person, who retrieved a carry-on sized bag and then exited through the building stairwell.

**Other evidence**

Video recorded on surveillance cameras showed Sterling crouching on the balcony of the apartment and subsequently jumping off the balcony. Surveillance video also showed Brooks running down the sidewalk away from the apartment building, and a silver Ford Explorer driving away from the apartment building after Sterling and Brooks had fled. Documents from a rental car company showed that a silver Ford Explorer was rented to Howard at the time of the crimes.

Police investigators recovered two types of expended nine-millimeter bullet casings from the crime scene. A total of nine Federal Cartridge brand casings were recovered, three inside the apartment near Murray's and Cover's bodies; two in the hallway

leading to the apartment entrance; and three in the stairwell. Three Winchester brand casings were also recovered, one in the driveway, and two in the stairwell. No Winchester casings were recovered from inside the apartment. Police investigators also recovered from the apartment a nine-millimeter semiautomatic pistol and an associated magazine. That gun had not been fired, and none of the bullet casings or bullet fragments found at the crime scene had come from that gun. Investigators determined that only one gun was fired inside the apartment, and that two different guns were fired in the stairwell and on the driveway.

In October 2013, police recovered a Smith and Wesson nine-millimeter handgun with its serial number partially scratched off (the Harbor gun) from a stolen vehicle in the Harbor area. The gun was silver with a black frame.

A ballistics expert testified at the trial that the three Winchester casings and four bullet fragments recovered from the apartment driveway and stairwell at the crime scene were fired from the Harbor gun. The nine Federal Cartridge casings were fired from a single, different gun, which was never recovered. Eleven bullet fragments, including fragments recovered from the bodies of Latty and Cover, were also fired from a single gun that was never recovered. None of the 11 bullet fragments or Federal Cartridge casings were fired from the Harbor gun.

CONTENTIONS ON APPEAL

Defendant contends his conviction must be reversed for the following reasons:

I. Trial counsel was ineffective by failing to request a limiting instruction as to the testimony of witness Damion regarding pretrial admissions made by Howard.

8

II.  The trial court improperly excluded evidence that Brooks had been involved in a shooting 30 days before the crimes.

III.  The trial court improperly allowed an investigating detective to testify about informant Smith's handwritten summary of a jailhouse conversation with Brooks.

IV.  The trial court erred by instructing the jury with CALCRIM No. 359 because the instruction improperly allowed the jury to conclude that defendant was the shooter based solely on his pretrial statements.

V.  The cumulative errors require reversal.

## DISCUSSION

### I.    Ineffective assistance of counsel

Defendant contends his counsel's failure to request a limiting instruction as to the testimony of Damion deprived him of his Sixth Amendment right to effective assistance of counsel.

#### A.    *Proceedings below*

##### 1. *First and second trials*

Damion did not testify at defendant's first trial in 2017.  At the second trial in 2018, the prosecutor said she intended to call Damion to testify about admissions Howard had made to him.  During an Evidence Code section 401 hearing, defendant's counsel asked the prosecutor to explain the scope of Damion's testimony and pointed out that the testimony might not be relevant or admissible as to defendant.  In response to the trial court's request for an offer of proof, the prosecutor stated that Damion and Howard had a phone conversation in which Howard admitted being present at the crime scene and that his cousin Lampart had been shot in the foot.  Damion and Howard later met in Florida where Howard said he had given the victims

marijuana to hold, the marijuana disappeared, and a shoot-out ensued. Howard admitted that he shot first.

When the trial court asked if the testimony would be limited to Howard, the prosecutor responded, "Correct." Defendant's counsel asked for a limiting instruction consistent with the prosecutor's offer of proof, and the trial court agreed to do so. Before Damion testified, the trial court instructed the jury that the testimony was limited to Howard, "not to Mr. Weir at all."

Damion testified at the second trial that he met with Howard at a park in Florida, where Howard told him he had given the victims a hundred pounds of marijuana. The marijuana was gone when Howard went to their apartment to retrieve it. A heated argument ensued, and shots were fired. Howard told Damion he started firing first, and the victims fired back. Howard said he went to the apartment with two other men, one of whom was Lampart, who was shot.

**2.** *Third trial*

At the third trial, the subject of this appeal, the prosecutor asked the trial court to issue a material witness warrant for Damion to ensure his presence to testify at trial about an admission of guilt made by Howard. Defendant's trial counsel did not ask for a limiting instruction at that time, nor did he do so at any time before, during, or after Damion's testimony.

Damion testified at the third trial that Howard told him that "[h]im [(Howard)] and the other person" started firing shots at the people who stole the marijuana. "His [(Howard's)] side [shot] first," and "three people got shot." The people who were shot lived in the apartment.

10

During cross-examination, defendant's counsel elicited Damion's testimony that Howard identified only himself and Lampart as being present at the crime scene. Counsel asked Damion if Howard "told you that he went there with himself and [Lampart]."[4] Damion answered, "Well, he didn't' tell me how he got there or who he went there with, just tell me who was there, but another person was there too." Counsel then asked, "So the only names he gave you were himself and [Lampart]; correct?" Damion responded, "Yeah."

## B. *Applicable law and standard of review*

The Sixth Amendment right to assistance of counsel includes the right to the effective assistance of counsel. (*Strickland v. Washington* (1984) 466 U.S. 668, 686-694 (*Strickland*).) It is the defendant's burden on appeal to demonstrate that trial counsel was inadequate and that prejudice resulted. (*People v. Lucas* (1995) 12 Cal.4th 415, 436.)

"'[I]t is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. [Citation.] A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action

---

[4] Damion referred to Lampart as "Shaka."

11

"might be considered sound trial strategy.""" (*People v. Ochoa* (1998) 19 Cal.4th 353, 445-446.)

"If the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged, an appellate claim of ineffective assistance of counsel must be rejected unless counsel was asked for an explanation and failed to provide one, or there simply could be no satisfactory explanation." (*People v. Carter* (2003) 30 Cal.4th 1166, 1211.)

## C. *No ineffective assistance*

Defendant fails to meet his burden of demonstrating that his trial counsel's failure to request a limiting instruction deprived defendant of his Sixth Amendment right to counsel. Defendant's counsel was not asked to explain why he did not request a limiting instruction concerning Damion's testimony, and the record does not support defendant's claim that counsel had no rational tactical purpose for not requesting such an instruction.

Defendant's counsel could have concluded that a limiting instruction was unnecessary because Damion's testimony did not implicate defendant. Damion testified that Howard said "[h]im [(Howard)] and the other person" started shooting, and that Howard's "side" shot first. Damion did not testify that Howard identified defendant as "the other person." During Damion's cross-examination, defendant's counsel clarified that the only people Howard identified by name on his "side" at the crime scene were Howard himself and Lampart.

Contrary to defendant's assertion, Damion's testimony does not clearly implicate defendant as the "other person" who started shooting. Damion testified on cross-examination that the only two people Howard identified by name were Howard himself and

12

Lampart. Counsel could reasonably have concluded that a limiting instruction was unnecessary because Howard did not identify defendant as the shooter or even having been present at the crime scene.

### D. *No prejudice*

Defendant also fails to establish that his counsel's allegedly deficient performance resulted in prejudice. Prejudice is shown by "'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" (*Strickland, supra*, 466 U.S. at p. 694.) Here, there was overwhelming evidence that defendant was the shooter. Two eyewitnesses, Brooks and Sterling, testified that they saw defendant point a gun at Murray and shoot. Both Brooks and Sterling fled the apartment and heard multiple gunshots as they were fleeing.

Although defendant sought to convince the jury that Brooks committed the murders, the physical evidence contradicted this theory. The evidence showed that none of the shots fired inside the apartment came from Brooks. Ballistics evidence confirmed that the "Harbor gun" linked to Brooks was fired only in the apartment building stairwell and on the driveway. It was not discharged inside the apartment. That evidence supported Brooks's testimony that he did not shoot until he was outside the apartment and running away from someone pursuing him. Bullet casings and bullet fragments recovered inside the apartment and from the bodies of Latty and Cover were not fired from the Harbor gun but from a second nine-millimeter gun that was never recovered.

That defendant's first two trials ended in hung juries and the third in his conviction does not persuade us that his counsel's

13

failure to request a limiting instruction as to Damion's testimony during the third trial was the cause of his conviction. We decline to speculate as to why the first two juries were unable to reach a verdict.

Defendant fails to establish that his counsel's failure to request a limiting instruction deprived him of his Sixth Amendment right to counsel or that he was prejudiced by his counsel's allegedly deficient performance.

## II. Exclusion of prior shooting incident

The trial court's preclusion of evidence that Brooks fired a gun 30 days before the subject crimes was not an abuse of discretion and did not violate defendant's constitutional rights to due process or to present a defense.

### A. *Proceedings below*

At a pretrial proceeding, defense counsel sought to present evidence that Brooks had fired a gun in a parking lot approximately 30 days before the subject crimes. The defense theory was that Brooks had started the shooting in the apartment and that he killed Murray, Cover, and Latty. Defense counsel argued that evidence of Brooks's prior aggressive conduct was admissible to prove that Brooks shot first and that defendant fired only in self-defense.

The prosecutor responded that Brooks had been arrested for the prior shooting incident but was released with no charges filed against him. The prosecutor argued that the prior incident had nothing to do with the case and would result in "a trial within a trial" to determine whether Brooks had been the aggressor during the prior incident. The prosecutor further argued there was no evidence that defendant or Howard knew

14

about the prior shooting incident. The trial court deferred ruling on the issue until after Brooks's direct testimony.

After the prosecution completed its direct examination of Brooks, defense counsel renewed their request to present evidence of Brooks's prior shooting incident. Defense counsel argued the prior shooting incident was admissible to show that Brooks had been the aggressor during the subject crimes and to refute Damion's testimony that Howard had admitted his side fired the first shots.

The prosecutor argued the prior incident would be admissible for self-defense purposes only if Howard and defendant knew about the incident at the time of the crimes. The prosecutor further argued there was no indication that Brooks had been the initial aggressor in the prior incident. The prosecutor explained that according to a witness's statement in a police report about the incident, Brooks and another customer had argued inside a club. When Brooks and his companion walked outside, the customer approached and fought with them. The customer then ran to get his friends, and the group approached Brooks. Brooks reached into his car, retrieved a blue steel semiautomatic gun, pointed it at the group, and then fired two rounds into the air. Everyone then left. The prosecutor argued there was also no evidence that Brooks had used the same gun in the prior incident and at the crime scene.

Defendant's counsel argued that Brooks's possession of another firearm during the prior incident was relevant because the murder weapon in this case had never been recovered. The trial court denied the request to present evidence of the prior incident, reasoning as follows:

> "The proper evidence does not show that Mr. Brooks
> was the aggressor in that prior incident. Case law is

15

clear. Prosecutor can't introduce evidence of a
defendant having firearms on some other occasion
unless there's proof that the prior possession of
firearms are the firearms involved in the prosecution
that the D.A. wishes to use the evidence for. So just
turn that around and what's good for the prosecutor
is good for the defense as well."

The trial court further ruled that the probative value of the
evidence concerning the prior incident was substantially
outweighed by its potential prejudice and consumption of time.

**B.** ***Applicable law and standard of review***

Only relevant evidence is admissible. (Evid. Code, § 350.)
Relevant evidence is evidence "having any tendency in reason to
prove or disprove any disputed fact that is of consequence to the
determination of the action." (Evid. Code, § 210.) Evidence is
relevant if it "tends 'logically, naturally, and by reasonable
inference' to establish material facts such as identity, intent, or
motive." (*People v. Garceau* (1993) 6 Cal.4th 140, 177,
disapproved on another ground in *People v. Yeoman* (2003) 31
Cal.4th 93, 117.) When a defendant asserts a claim of self-
defense, evidence of a victim's violent character is admissible
under Evidence Code section 1103 to show the victim was the
aggressor at the time of a killing. (*People v. Minifie* (1996) 13
Cal.4th 1055, 1070.)

A trial court "in its discretion may exclude evidence if its
probative value is substantially outweighed by the probability
that its admission will (a) necessitate undue consumption of time
or (b) create substantial danger of undue prejudice, of confusing
the issues, or of misleading the jury." (Evid. Code, § 352.)
Evidence Code section 780 makes admissible any evidence
relevant to prove that a witness is credible unless the evidence is

16

made inadmissible under some other statute or is precluded by a trial court ruling under Evidence Code section 352.

A trial court has broad discretion to exclude impeachment evidence on collateral matters, particularly when such evidence may create undue prejudice or confusion.  (*People v. Lavergne* (1971) 4 Cal.3d 735, 741-744.)  A trial court's ruling on the admissibility of evidence is reviewed for abuse of discretion.  (*People v. Cox* (2003) 30 Cal.4th 916, 955, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

### C.   *No abuse of discretion and no constitutional violation*

The record discloses no abuse of discretion.  Brooks's possession of another firearm, and his involvement in a separate, prior shooting that resulted in no injuries and in which there was no evidence he had initiated the conflict, was a collateral matter that had minimal bearing, if any, on the case.  (See *People v. Gurule* (2002) 28 Cal.4th 557, 619.)

As to defendant's constitutional claims, our Supreme Court has held that "not every restriction on a defendant's desired method of cross-examination is a constitutional violation.  Within the confines of the confrontation clause, the trial court retains wide latitude in restricting cross-examination that is repetitive, prejudicial, confusing of the issues, or of marginal relevance."  (*People v. Frye* (1998) 18 Cal.4th 894, 946, disapproved on another ground by *People v. Doolin, supra*, 45 Cal.4th at p. 421, fn. 22.)

### III.   Admission of Detective Romero's testimony

The trial court's admission of investigating Detective Luis Romero's testimony about informant Smith's handwritten notes

17

on Smith's jail conversation with Brooks did not violate defendant's due process right to a fair trial.

### A. *Proceedings below*

Brooks was arrested on the day of the murders. While in custody, he was placed in a cell with an informant named Smith, who was wearing a hidden recording device. Because the device malfunctioned, an investigating detective had Smith memorialize his conversation with Brooks immediately after the operation. Smith's handwritten note was admitted into evidence.

Smith's note states in pertinent part that Brooks said he was in jail for a triple murder, that the shooting had occurred because "they tried to play him out his dope" and "he had to handle his business." The note further states, "murder weapon was 9 . . . mill;" and "says he got rid of murder weapon."

Smith testified at trial that he knew he was participating in a murder investigation, and he assumed Brooks was the suspected killer. Smith explained that his handwritten notes were not verbatim quotes of what Brooks had told him but were his interpretation of Brooks's statements. Smith testified that Brooks did not actually say "they tried to play him out his dope," but instead "that it was something like a distribution of drugs." As to his notes concerning the murder weapon, Smith testified that Brooks did not admit to murdering anyone but said he had possessed a firearm, and Smith assumed Brooks was referring to the murder weapon.

During his testimony at trial, Brooks denied telling Smith that he had killed three people or that the shooting occurred because "they tried to play him out his dope." Brooks also denied saying that he had to "handle his business."

18

Detective Romero testified that during his investigation of the murders in May 2013, the police could not at that time eliminate Brooks as a suspect. After Brooks's arrest, Romero had him placed in the same jail cell with informant Smith, who wore a recording device that malfunctioned. Romero testified that when he first reviewed Smith's notes summarizing his jail conversation with Brooks, Romero had no reason or evidence to question those notes. When the prosecutor asked Romero whether his opinion regarding Smith's notes subsequently changed, defendant's counsel objected that Romero was "[v]ouching." The trial court overruled the objection, stating, "It's just to describe the course of the investigation, not as to the truth of what the detective believes the culpability of different people are. Not for that."

Romero then testified that his opinion about the value of Smith's notes changed as the murder investigation progressed "because I was comparing what was written to the physical evidence." Romero further testified that he did not question Brooks in March 2014 about the contents of Smith's handwritten notes because the police at that point had identified defendant and Howard as suspects and "had the gun analyzed." Defense counsel again objected that Romero was "vouching" and that his personal beliefs were not relevant.

The trial court overruled the objection, stating, "the opinions of the detective are being allowed by me just to describe the course of his investigation why he did things, why he didn't do things. It's not for the truth of it." The court then addressed the jury: "You, the jury, decide the culpability, not the detective."

**B.** *No error and no due process violation*

A witness's lay testimony about the veracity of another witness's statements is inadmissible because it is not relevant to the issue of the statement's credibility and because it invades the province of the jury to determine the facts. (*People v. Zambrano* (2004) 124 Cal.App.4th 228, 239; *People v. Melton* (1988) 44 Cal.3d 713, 744.) We review the admission of witness testimony under the abuse of discretion standard. (*People v. Kovacich* (2011) 201 Cal.App.4th 863, 902.)

The record does not support defendant's assertion that Romero's testimony was erroneously admitted to establish the veracity of Smith's handwritten notes. Rather, the record shows that the trial court admitted Romero's testimony solely for the purpose of describing the course of his investigation. The trial court expressly instructed the jury that Romero's statements were not to be considered to assess the truth of Smith's written statements and that the jury alone was to determine culpability.

The trial court also instructed the jury pursuant to CALCRIM No. 226 that "[y]ou alone must judge the credibility or believability of the witnesses" and CALCRIM No. 200, which states: "You must decide what the facts are. It is up to all of you, and you alone[,] to decide what happened . . . ." We presume the jury understood and followed those instructions. (*People v. Smith* (2007) 40 Cal.4th 483, 517-518.)

Defendant has demonstrated no error and no due process violation.

## IV. CALCRIM No. 359

Defendant contends the trial court erred in instructing the jury with CALCRIM No. 359 because the instruction erroneously permitted the jury to conclude he was the killer based on his out-

of-court statements alone, thereby reducing the prosecution's burden of proof and undermining the presumption of defendant's innocence.

### A. *Proceedings below*

#### 1. *Defendant's pretrial statements*

##### a. Statements to Donna Jones

Donna Jones testified that she and defendant were dating in May 2013. On the morning of May 10, 2013, Jones picked up defendant after he called asking her for a ride. While they were in the car together, Jones received a phone call from a friend asking about defendant and "Que"[5] and if they were both okay. Jones then handed the phone to defendant, and she heard defendant say he was good. Jones then heard defendant say "Que." Jones asked defendant what the call was about, and he told her it was not her business.

The prosecutor asked Jones if she remembered defendant saying something to the effect of Que got away. When Jones said she did not remember, the prosecutor presented Jones's prior testimony, which included the following exchange:

"Question: When you talked to the detectives a couple of years ago, if you told them that [defendant][6] said—[defendant] said quote 'Fuck. Que got away.' Would that have been the truth?

"Answer: Yeah."

---

[5]     Several witnesses referred to Brooks as "Que."

[6]     Jones knew defendant as "Craig" and referred to him by that name throughout her testimony.

21

After hearing the prosecutor read the prior testimony, Jones admitted, "If you have it there, that's what I told the detective."

### b.      Statements to Detective Romero

A few days after defendant was arrested for the subject murders, he told Detective Romero that he had never been to Murray and Cover's apartment.  Defendant said he was familiar with Murray, Cover, and Latty and had seen them at a club the day before the murders.  Defendant said he later left the club and returned home alone.  He had no information about the murders.

### 2. *CALCRIM No. 359*

The trial court instructed the jury with CALCRIM No. 359 as follows:

> "A defendant may not be convicted of any crime based on his out-of-court statements alone.  You may rely on a defendant's out-of-court statements to convict him only if you first conclude that other evidence shows that the charged crime was committed.

> "That other evidence may be slight and need only be enough to support a reasonable inference that a crime was committed.

> "This requirement of other evidence does not apply to proving the identity of the person who committed the crime.  If other evidence shows that the charged crime was committed, the identity of the person who committed it may be proved by the defendant's statement alone.

> "You may not convict a defendant unless the People have proved him guilt[y] beyond a reasonable doubt."

**B.** *Forfeiture*

Defendant forfeited any objection based on alleged instructional error because his defense counsel did not object to CALCRIM No. 359. "Failure to object to instructional error forfeits the issue on appeal unless the error affects defendant's substantial rights." (*People v. Anderson* (2007) 152 Cal.App.4th 919, 927.) Even absent any forfeiture, we find no instructional error and consequently no violation of defendant's rights.

**C.** *No instructional error*

Defendant cites *People v. Rivas* (2013) 214 Cal.App.4th 1410 (*Rivas*) as support for his argument that the trial court's instruction was both erroneous and contradictory because it informed the jury that a defendant may not be convicted of any crime based solely on his out-of-court statements, but also stated that the identity of the person who committed the crimes could be proved by the defendant's statement alone. The court in *Rivas* found a previous version of CALCRIM No. 359[7] to be deficient

_____

[7]    CALCRIM No. 359 in effect at the time of the *Rivas* court's decision stated:

> "The defendant may not be convicted of any crime based on (his/her) out-of-court statement[s] alone. You may only rely on the defendant's out-of-court statements to convict (him/her) if you conclude that other evidence shows that the charged crime [or a lesser included offense] was committed.

> "That other evidence may be slight and need only be strong enough to support a reasonable inference that a crime was committed.

23

because "the reference to identity in CALCRIM No. 359 presents a risk of confounding the jury by telling jurors that a defendant's inculpatory extrajudicial statements, taken alone, do not suffice to allow the jury to convict the defendant of a charged crime— and yet those statements, again taken alone, are entertainable to prove the defendant's 'identity [as] the person who committed the crime' (CALCRIM No. 359, 3d par.), which to any juror can only mean the defendant's identity as the perpetrator, i.e., the guilty party.  The instruction requires reconsideration." (*Rivas*, at p. 1429.)

The court in *People v. Rosales* (2014) 222 Cal.App.4th 1254 (*Rosales*) disagreed with the *Rivas* court's conclusion that CALCRIM No. 359 incorrectly stated California law.  The court in *Rosales* noted that California law requires that some evidence independent of a defendant's out-of-court statements must be introduced to prove the corpus delicti, or commission of the crime itself.  (*Rosales*, at p. 1260.)  The court further noted that California law permits use of a defendant's inculpatory out-of-court statements to establish his identity as the perpetrator of a crime.  (*Ibid.*)  The court in *Rosales* found no confusion of these two principles in CALCRIM No. 359:

> "The corpus delicti rule is stated in the first two paragraphs of CALCRIM No. 359.  The law concerning proof of identity by a defendant's

---

> "The identity of the person who committed the crime [and the degree of the crime] may be proved by the defendant's statement[s] alone.

> "You may not convict the defendant unless the People have proved (his/her) guilt beyond a reasonable doubt."

24

extrajudicial statements is correctly stated in the third paragraph. There is no danger a jury will be unable to separate the two rules any more than in CALJIC No. 2[.]72,[8] which has been approved by our Supreme Court . . . . CALCRIM No. 359 correctly states the law. [Citations.] There was no reasonable likelihood the jury was confused and misapplied the instruction. Finally CALCRIM No. 359 reminds the jury that the accused may not be convicted unless the prosecution proves guilt beyond a reasonable doubt." (*Rosales*, at pp. 1260-1261.)

We agree with the *Rosales* court's conclusion that CALCRIM No. 359 is a correct statement of California law. We further conclude there was no reasonable likelihood the jury in this case was confused and misapplied the instruction. CALCRIM No. 359, moreover, was modified after the *Rivas* court's decision to address the concerns raised by the court in that case. (CALCRIM No. 359 (2018 rev.).) The modified instruction was given by the trial court in this case.

We find no instructional error and no reasonable likelihood of jury confusion or misapplication of the trial court's instructions.

## V. Alleged cumulative error

We reject defendant's contention that the cumulative effect of the claimed errors identified in his appeal deprived him of due

---

8      CALJIC No. 2.72, similar to CALCRIM No. 359 allows use of an out of court statement to establish a perpetrator's identity: "The identity of the person who is alleged to have committed a crime is not an element of the crime . . . . The identity . . . may be established by [a] [an] [confession] [or] [admission]." The California Supreme Court in *People v. Foster* (2010) 50 Cal.4th 1301, 1344-1345, approved the use of CALJIC No. 2.72.

process of law and a fair trial. Because we have found none of the claimed errors to constitute individual errors, they cannot as a group constitute cumulative error. (*People v. Richardson* (2008) 43 Cal.4th 959, 1036, abrogated on other grounds by statutory repeal as stated in *People v. Nieves* (2021) 11 Cal.5th 404, 509; *People v. Lopez* (2021) 73 Cal.App.5th 327, 348.)

## VI. Modification of judgment

Government Code section 70373, subdivision (a) requires that a $30 assessment be imposed on every conviction for a criminal offense. Penal Code section 1465.8, subdivision (a) similarly requires that a $40 assessment be imposed on every conviction for a criminal offense. Defendant was convicted of three counts of first degree murder, but the sentencing minute order and abstract of judgment reflect the imposition of only one Government Code section 70373 assessment and only one section 1465.8 assessment. The omission of such assessments and penalties may be corrected for the first time on appeal. (*People v. Castellanos* (2009) 175 Cal.App.4th 1524, 1530.)

The Attorney General contends the judgment should be corrected to reflect the imposition of three $30 Government Code section 70373, subdivision (a) assessments and three $40 Penal Code section 1465.8, subdivision (a) assessments. Defendant does not argue otherwise. We therefore direct the trial court to amend the judgment, the sentencing minute order, and abstract of judgment accordingly.

## DISPOSITION

We direct the trial court to amend the judgment, sentencing minute order, and abstract of judgment to reflect the imposition of three $30 Government Code section 70373,

26

subdivision (a) assessments and three $40 Penal Code section 1465.8, subdivision (a) assessments.  In all other respects, the judgment is affirmed.


CHAVEZ, Acting P. J.

We concur:


HOFFSTADT, J.


BENKE, J.*

*       Retired Associate Justice of the Court of Appeal, Fourth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.